UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

AMERICAN FEDERAL BANK,

                    Plaintiff,

v.

WEST CENTRAL AG SERVICES, CHAD OBERG, RICHARD OBERG, LESLIE OBERG, and LAUREL OBERG,

                    Defendants.

Civil No. 19-2337 (JRT/LIB)

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT WEST CENTRAL AG SERVICES' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Matthew J. Bialick, **MJB LAW FIRM PLLC**, 7925 Stone Creek Drive, Suite 103, Chanhassen, MN 55317, for plaintiff.

Steven Kinsella and Samuel Andre, **FREDRIKSON & BYRON PA**, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402, for defendant West Central Ag Services.

Erik A. Ahlgren, **AHLGREN LAW OFFICE PLLC**, 220 West Washington Avenue, Suite 105, Fergus Falls, MN 56537, for defendants Chad Oberg, Richard Oberg, Leslie Oberg, and Laurel Oberg.

Plaintiff American Federal Bank ("AFB") made two large loans to Defendants, the Obergs, for their farming business, Oberg Family Farms. Allegedly unknown to AFB, Oberg Family Farms was in the midst of financial freefall when the Obergs obtained the loans. After the Obergs defaulted on the loans, AFB filed a Complaint alleging breach of contract and fraudulent inducement against the Obergs. AFB also claims that the Obergs made a voidable or fraudulent transfer using proceeds from an AFB loan to pay another one of

their creditors, West Central Ag Services ("West Central"), with the intent to defraud or hinder AFB, and therefore West Central is liable to AFB under the Minnesota Uniform Voidable Transactions Act ("MUVTA").

West Central has filed a Motion for Summary Judgment on AFB's voidable transfer claim. Because the payment at issue was made using funds from a fully encumbered deposit account, the Court finds that the payment does not qualify as a transfer of an asset as required to bring a claim under MUVTA. As such, AFB's claim fails as a matter of law, and the Court will grant West Central's Motion.

AFB has filed a Motion for Summary Judgment on its breach of contract and fraudulent inducement claims against the Obergs. The Obergs do not dispute the breach of contract claims, and the Court will grant AFB's Motion as to Counts I and II because there remains no genuine dispute of material fact. As to fraudulent inducement, although it is undisputed that the Obergs misrepresented their financial position at the time they obtained the loans from AFB, the Court finds that there remains a genuine dispute of material fact as to whether AFB reasonably relied on the Obergs' representations, and will therefore deny AFB's Motion as to Count III.

## BACKGROUND

**I.   FACTS**

Defendants Richard Oberg, Laurel Oberg, Chad Oberg, and Leslie Oberg (collectively, the "Obergs") ran a large farming operation in Moorhead, Minnesota called

"Oberg Family Farms." (*See* Decl. Chad Oberg ¶¶ 1, 3, Dec. 7, 2020, Docket No. 64). Richard and Laurel began transitioning the farm to Chad's operational control around 2010, (Decl. Richard Oberg ¶ 2, Dec. 7, 2020, Docket No. 65), and Chad operated Oberg Family Farms through 2018, (Decl. Chad Oberg ¶ 1.) In 2019, Chad liquidated the farm's assets in cooperation with his lenders, and Oberg Family Farms is no longer operational and has no assets. (*Id.*)

### A. The Obergs' Banking Relationship with Bell Bank

The Obergs had a long-term banking relationship for the farm with Bell Bank. (*See generally* 2nd Decl. Matthew Bialick ¶ 3, Ex. A ("2018 Forbearance Agreement"), Nov. 20, 2020, Docket No. 58-1.) The Obergs obtained multiple loans from Bell Bank, which were secured by, among other things, an interest in the Obergs' grain and operating accounts maintained through Bell Bank. (2018 Forbearance Agreement at 3–4, 7; *see also* Aff. Blain Christianson ("Christianson Aff.") ¶ 24, July 27, 2020, Docket No. 39; Decl. Steven Kinsella ("Kinsella Decl.") ¶ 15, Ex. 30, July 27, 2020, Docket No. 40-18.)

On July 20, 2018, the Obergs defaulted on a loan payment to Bell Bank for the first time. (2018 Forbearance Agreement at 5.) The Obergs again defaulted on a loan payment to Bell Bank on August 20, 2018. (*Id.*) In September 2018, Bell Bank and the Obergs executed a forbearance agreement (the "2018 Forbearance Agreement") because of the defaults. (*See generally id.*) The 2018 Forbearance Agreement stated that, as of August

30, 2018, the Obergs owed Bell Bank $38,583,800.51 in principal, interest, and fees. (*Id.* at 5.)

### B.     The Obergs' 2017 and 2018 Lines of Credit with West Central Ag Services

Starting in 2009, the Obergs were patrons of Defendant West Central Ag Services ("West Central"), a Minnesota cooperative that provides a range of services to approximately 1500 qualifying patrons, including grain purchasing, grain merchandising, agricultural inputs, crop insurance, and producer financing. (Christianson Aff. ¶¶ 18–20.)

In 2017, the Obergs substantially increased their agricultural input purchases from West Central. (Christianson Aff. ¶ 23.) West Central conducted a review of the Obergs' business and finances, which demonstrated their creditworthiness, (*id.* ¶ 24), and on June 14, 2017, West Central and the Obergs entered a revolving line of credit for agricultural input purchases (the "2017 LOC") allowing the Obergs to access up to $1.5 million of purchases without interest, (*id.* ¶¶ 25–26; *see also id.* ¶ 3, Ex. 2, July 27, 2020, Docket No. 39-3.) Pursuant to standard practices, West Central secured the 2017 LOC by obtaining a security interest in Oberg Family Farms' then-owned or later-acquired inventory and goods; equipment and machinery; crops; livestock and poultry; feed, seed, fertilizer, and chemicals; and stock, patronage rights, and allocated surplus in West Central. (Christianson Aff. ¶¶ 27–29.) West Central perfected its security interest by filing appropriate financing statements. (*Id.* ¶ 30.) Throughout 2017, the Obergs purchased over $2.7 million in agricultural inputs from West Central, (*id.* ¶ 35), and they paid the full

balance owed to West Central by the final due date of the 2017 LOC in March 2018, (*id.* ¶ 34.)

The Obergs took out another $1.5 million line of credit with West Central for the 2018 season (the "2018 LOC"). (*Id.* ¶ 37; *see also id.* ¶ 8, Ex. 7, July 27, 2020, Docket No. 39-13.) West Central extended the 2018 LOC based on the Obergs' 2016 financial information, their performance under the 2017 LOC, and a $2 million pre-payment made in March 2018. (Christianson Aff. ¶ 37.) The line of credit was secured by a personal guarantee from the Obergs, except Leslie, and a security agreement covering the same collateral as the 2017 LOC. (*Id.* ¶¶ 38–39.) As of August 1, 2018, the Obergs had a balance of over $2.6 million on the 2018 LOC. (2nd Bialick Decl. ¶ 6, Ex. D at 1, Nov. 20, 2020, Docket No. 58-4.)

On September 14, 2018, West Central perfected its security interests in some of the Obergs' agricultural collateral by filing a statutory lien notice, called a "CNS Financing Statement." (1st Bialick Decl. ¶ 10, Ex. H, Aug. 17, 2020, Docket No. 45-9.) By filing the CNS Financing Statement, West Central became an additional payee on the Obergs' grain checks, in addition to the Obergs themselves and Bell Bank, (Christianson Aff. ¶ 12, Ex. 11, July 27, 2020, Docket No. 39-17; Christianson Aff. ¶ 14, Ex. 13, July 27, 2020, Docket No. 39-10), and West Central was then required to endorse grain checks before they could be cashed. (Christianson Aff. ¶ 44.)

On October 1, 2018, West Central sent the Obergs a billing statement that showed that over $2.3 million was due on October 15, 2018. (1st Bialick Decl. ¶ 7, Ex. E at 45, Aug. 17, 2020, Docket No. 45-6.) On October 16, 2018, the Obergs wrote a check for $800,000 to West Central as partial payment. (Christianson Aff. ¶ 47.) On October 24, West Central deposited the $800,000 check and applied it toward the Obergs' 2018 LOC balance. (Christianson Aff. ¶ 48.)

In February 2019, the remaining balance on the 2018 LOC came due, and the Obergs did not respond to West Central's request for payment. (Christianson Aff. ¶ 54.) West Central then commenced a breach of contract action against the Obergs in Clay County, Minnesota. (Kinsella Decl. ¶ 9, Ex. 24, July 27, 2020, Docket No. 40-12.)

### C. The Obergs' Loans from AFB for Grain Bin and New Home Construction

On May 23, 2018, the Obergs received a bid for construction of a large grain bin. (Aff. Chris Schenck ("Schenck Aff.") ¶ 3, Ex. A, Nov. 19, 2020, Docket No. 56-1.) AFB prepared a loan proposal, dated June 25, 2018, for the Obergs to finance the grain bin. (Kinsella Decl. ¶ 2, Ex. 17, July 27, 2020, Docket No. 40-2.) The AFB Loan Proposal indicated that Chad was an above-average manager and there was a low risk to loaning funds to the Obergs based on the bank representative's familiarity with the Obergs' operation. (*See id.* Ex. 17 at 8–9.) AFB conducted an independent appraisal of the grain bin site. (*See* Kinsella Decl. ¶ 3, Ex. 18.1, July 27, 2020, Docket No. 40-3.)

-6-

Sometime in early August 2018, the Obergs followed up with AFB about financing the construction of the new grain bin. (Schenck Aff. ¶ 4.) On September 25, 2018, AFB made a $900,000 loan for the purpose of constructing a grain bin (the "$900K Loan"), (*id.* ¶ 6), secured by a mortgage on the grain bin site, (*id.* ¶ 7, Ex. D, Nov. 19, 2020, Docket No. 56-4.) Payments were to be made on December 1 of each year in the amount of $121,025. (Schenck Aff. ¶ 6, Ex. C at 1, Nov. 19, 2020, Docket No. 56-3.) The loan was secured by a first mortgage over the grain bin site which, it appears, was not perfected. (*See* Kinsella Decl. ¶ 4, Ex. 19 at 2, July 27, 2020, Docket No. 40-6 (listing security interests of parties and not stating that AFB's interest was perfected).)

To secure the loan, the Obergs provided AFB with a consolidated financial statement dated December 31, 2017. (*See* Schenck Aff. ¶ 8, Ex. E at 1, Nov. 19, 2020, Docket No. 56-5.) The loan documents included a financial representation and warranty clause that each Oberg signed. The representation stated:

> **FINANCIAL CONDITION. BY SIGNING THIS AUTHORIZATION, BORROWER REPRESENTS AND WARRANTS TO LENDER THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND CORRECT AND THAT THERE HAS BEEN NO MATERIAL ADVERSE CHANGE IN BORROWER'S FINANCIAL CONDITION AS DISCLOSED IN BORROWER'S MOST RECENT FINANCIAL STATEMENT TO LENDER.**

(Schenck Aff. ¶ 9, Ex. F, Nov. 19, 2020, Docket No. 56-6.) Although they had entered the forbearance agreement with Bell Bank just a few days prior, the Obergs did not disclose that agreement, or any other updated financial information, to AFB at the time they signed the loan documents. (Schenck Aff. ¶ 10.) AFB also states that the Obergs

represented that they had not completed their 2017 tax returns at the time of the loan, even though the returns were completed as of July 25, 2018. (*Id.* ¶ 12; 2nd Bialick Decl. ¶ 4, Ex. B, Nov. 20, 2020, Docket No. 58-2).

The loan proceeds were deposited into the Obergs' operating account on September 27, 2018. (2nd Bialick Decl. ¶ 8, Ex. F, Nov. 20, 2020, Docket No. 58-6.) Construction on the new grain bin began November 14, 2018 and was completed on December 31, 2018. (Kinsella Decl. ¶ 5, Ex. 20 ¶ 30, July 27, 2020, Docket No. 40-7.) However, expert testimony submitted by AFB from a forensic accounting analysis shows that the $900K loan funds were not used for construction of the grain bin. (1st Bialick Decl. ¶ 11, Ex. I at 5, 12–14, Aug. 17, 2020, Docket No. 45-9.)

On December 13, 2018, AFB made a $700,000 loan to Chad and Leslie Oberg for the express purpose of new home construction, relying on the same financial information disclosed for the $900K loan, with no updates from the Obergs. (Kinsella Decl. ¶ 6, Ex. 21, July 27, 2020, Docket No. 40-8.) As part of the loan proposal, AFB stated that the Obergs' yields exceeded projections, that it anticipated positive cash flow for 2018, and that AFB would obtain additional financial information. (Kinsella Decl. ¶ 6, Ex. 21 at 8.) The loan proceeds were deposited in the Obergs' operating account over December 2018 and January 2019. (2nd Bialick Decl. ¶ 13, Ex. K, Nov. 20, 2020, Docket No. 58-11.)

On December 1, 2019, the Obergs defaulted on their payment toward the $900K loan. (Schenck Aff. ¶ 14.)

## II. PROCEDURAL HISTORY

On August 23, 2019, AFB filed a Complaint against West Central and the Obergs pursuant to the Court's diversity jurisdiction. (Compl., Aug. 23, 2019, Docket No. 1.) AFB brings claims for breach of contract on the $900,000 loan against the Obergs (Count I); breach of contract on the $700,000 loan against Chad and Leslie Oberg (Count II); fraud in the inducement against the Obergs (Count III); and fraudulent/voidable transfer against West Central (Count IV). (*Id.* ¶¶ 69–90.)

West Central filed an Answer to AFB's Complaint and a Crossclaim against Chad, Richard, and Laurel Oberg on September 19, 2019.[1] (Answer & Crosscl., Sept. 19, 2019, Docket No. 9.) On October 15, 2019, the Obergs filed their Answer to AFB's Complaint and West Central's Crossclaim. (Answer, Oct. 15, 2019, Docket No. 20.)

On July 27, 2020, West Central filed a Motion for Summary Judgment on Count IV.[2] (W. Cent. Mot. Summ. J., July 27, 2020, Docket No. 37.) AFB filed a Motion for Summary

---

[1] West Central's Crossclaim against the Obergs, not at issue in the present Motions, asserts that if West Central is required to make a payment to AFB, West Central is entitled to recover the amount from the Obergs. (Answer & Crosscl. at 15, ¶ 11.)

[2] West Central filed its motion prior to the close of discovery on September 21, 2020. (*See* Pretrial Scheduling Order, Jan. 27, 2020, Docket No. 36). AFB has asked the Court to defer summary judgment to permit additional discovery, specifically to take depositions. Summary judgment is appropriate only after the nonmovant has had adequate time for discovery. *Jackson v. Riebold*, 815 F.3d 1114, 1121 (8th Cir. 2016). AFB represented to the Court that depositions were taken after West Central filed its motion, but transcripts have not been submitted to the Court. If AFB wanted the Court to consider deposition evidence for the Motions for Summary Judgment, the proper course would have been to file a motion asking the Magistrate Judge to reopen discovery in order to file additional exhibits. In the absence of that step, the Court finds that there was adequate time for discovery, and will not defer ruling on the Motions.

Judgment on Counts I, II, and III, against the Obergs, on November 19, 2020. (AFB Mot. Summ. J., Nov. 19, 2020, Docket No. 53.) In their response to AFB's Motion, the Obergs consented to summary judgment as to Counts I and II, but dispute the Motion as to Count III. (*See* Oberg Mem. Opp. Summ. J. at 1, Dec. 7, 2020, Docket No. 63.)[3]

## DISCUSSION

### I. STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable

---

[3] Although AFB's Motion for Summary Judgment is only related to the claims against the Obergs, West Central filed a "Limited Objection" to AFB's Motion on December 8, 2020. (W. Cent. Obj., Dec. 8, 2020, Docket No. 68.) West Central's Limited Objection is meant to "address certain factual findings sought by AFB within its Motion papers that are not relevant to the claims against the Obergs and represent contested facts between AFB and West Central." (*Id.* at 1.) Specifically, West Central informs the Court that facts regarding offsets are not related to AFB's claims against the Obergs and there is a material dispute about the alleged facts, and requests the Court not enter the proposed factual findings. (*Id.* at 2–3.) The Court will not make any factual findings in deciding AFB's Motion for Summary Judgment but will rely only on undisputed facts.

inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). The nonmoving party also may not "merely point to unsupported self-serving allegations, but must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor without resort to speculation, conjecture, or fantasy." *Reed v. City of St. Charles*, 561 F.3d 788, 790–91 (8th Cir. 2009) (quotations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. At the summary judgment stage, the Court may not make credibility determinations or weigh the evidence before it. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

**II.     WEST CENTRAL'S MOTION FOR SUMMARY JUDGMENT**

West Central has moved for summary judgment on the only claim against it, Count IV for Fraudulent/Voidable Transfer, arguing that the $800,000 payment from the Obergs to West Central in October 2018 (the "Payment") was not a voidable transfer. Pursuant

to the Minnesota Uniform Voidable Transactions Act ("MUVTA"),[4] a transfer is voidable if the debtor made the transfer "(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation[.]" Minn. Stat § 513.44(a).

Whether a payment is a "transfer" such that it is subject to claims under the MUVTA is a threshold question of statutory interpretation. *See Citizens State Bank Norwood Young Am. v. Brown*, 849 N.W.2d 55, 60 (Minn. 2014). For purposes of the MUVTA, a "transfer" is defined, in relevant part, as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, license, and creation of a lien or other encumbrance." Minn. Stat. § 513.41(16). An "asset" is defined as "property of a debtor," excluding, among other things, "property to the extent it is encumbered by a valid lien." Minn. Stat. § 513.41(2)(i). Under the MUVTA, liens include "a charge against or an interest in property to secure payment of a debt or performance of an obligation, and includes a security interest created by agreement, a judicial lien obtained by legal or equitable process or proceedings, a common-law lien, or a statutory lien." Minn. Stat. § 513.41(9).

---

[4] The Uniform Voidable Transactions Act was adopted in Minnesota in 2015 and replaced the Uniform Fraudulent Transfer Act, but the provisions are the same. *See* Minn. Stat. § 513.51.

Here, West Central argues that it is entitled to judgment as a matter of law because the Payment is not a "transfer." According to West Central, the funds used to make the Payment were encumbered by Bell Bank's security interest in the Obergs' operation account, and therefore are not considered an "asset," and thus are excluded from the definition of a "transfer" under the MUVTA.

The parties have cited no binding interpretation of "asset" or "transfer" from a Minnesota court to guide the Court's analysis of whether the Payment is subject to a claim under the MUVTA. Other courts, however, have found that fully encumbered proceeds or non-cash collateral are excluded from the definitions of "asset" and "transfer" under uniform voidable transfer acts. *See, e.g.*, *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 415–16 (5th Cir. 2009) (proceeds from sale of business encumbered by a valid lien); *Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F. Supp. 2d 821, 838–39 (N.D. Iowa 2004) (real property and equipment encumbered by a valid lien).

Yet an encumbered deposit account differs from other types of encumbered collateral in two relevant ways: the security interest can only be perfected by control, Minn. Stat. § 336.9-312(b)(1), and a transferee of funds from an encumbered deposit account takes free and clear of the security interest, Minn. Stat. § 336.9-332(b). Based on these differences, AFB argues that the Payment is a voidable transfer under the MUVTA because its definition of "asset" excludes "property to the extent it is encumbered by a valid lien," Minn. Stat. § 513.41(2)(i), which, according to AFB, only

-13-

excludes property that is received by the transferee subject to the applicable lien, which a deposit account is not.

To resolve the question of whether the Payment to West Central is subject to a claim under the MUVTA, the Court must therefore determine whether the definition of "asset" excludes property only if it is encumbered both before and after a transfer, or also excludes property that is encumbered before transfer, but is received free and clear of the lien. The Sixth Circuit, facing a nearly identical scenario, concluded that the plain language of the Ohio Uniform Fraudulent Transfer Act directs courts to examine whether property was encumbered before a transfer. *See Thermo Credit LLC v. DCA Servs., Inc.*, 755 Fed. App'x 450, 455 (6th Cir. 2018). Although payments out of a deposit account are generally transferred free of security interests, the Sixth Circuit reasoned that because the definition of "asset" is "property of a debtor," *see* Ohio Rev. Code § 1336.01(B), "the proper time to evaluate whether the property was encumbered is prior to the transfer, when it was in [the debtor's] possession and control." *Id.* at 455–56.[5] As such, although the transferee may have received a payment free from any security interest, the funds used to make the payment were not free from encumbrances at the time of payment,

---

[5] *Accord Zurick Am. Ins. Co. v. MB Fin. Bank, N.A.*, 2020 WL 4913178, at *8 (Ill. Ct. App. Aug. 19, 2020) (concluding that funds in a deposit account were not assets under the Illinois Uniform Fraudulent Transfer Act because there was a lien on the account at the time a payment was made from the account). The Illinois court also relied on whether the funds were encumbered while in the debtor's possession, not whether the funds continued to be encumbered after payment to the transferee. *Id.*

and as long as the funds remained in the transferor's possession, they were still subject to a lien  *Id.* at 455.

The Court agrees with the Sixth Circuit's reading of the plain language of Ohio's uniform act, which is nearly identical to Minnesota's.  The definition of "asset" under the MUVTA is "property of the debtor" except "property to the extent it is encumbered by a valid lien."  Minn. Stat. § 513.41(2)(i).  Thus, the statute's definition of "asset" requires determining whether the property at issue is encumbered before transfer, when it is property of the debtor.  Applied here, funds in the Obergs' operating account are not an asset under the MUVTA because they were fully encumbered by Bell Bank's perfected security interest while those funds were the Obergs' property—before the Obergs made the Payment.

AFB argues that excluding payments from encumbered deposit accounts from potential liability under the MUVTA creates a large gap that could not have been intended by the state legislature since, according to AFB, it would permit fraudulent transfers of funds from bank accounts to escape scrutiny.  However, the purpose of MUVTA is not so broad as to cover all instances of fraud or theft.  Rather, its purpose is to "prevent debtors from putting property which is available for the payment of their debts beyond the reach of their creditors."  *In re Butler*, 552 N.W.2d 226, 232 (Minn. 1996) (citation omitted); *see also Alerus Fin., Nat. Ass'n v. Martin Holdings, LLC*, No. A13-0407, 2013 WL 6390337, at *3 (Minn. Ct. App. 2013) ("Because a lienholder's claim of right to an encumbered

property always trumps that of a general creditor, a debtor cannot use that property to satisfy general debts and MUFTA does not apply to the extent of the lien.").

Here, AFB, West Central, and Bell Bank are all secured creditors of the Obergs. Crucially, however, only Bell Bank had a perfected security interest in the operating account since it had control over the account, meaning that in a hypothetical collection action, Bell Bank would have priority over AFB for funds from the operating account, and AFB would have no claim to the funds. Yet under AFB's reading of MUVTA, AFB would be able to recover funds from the Obergs' deposit account through a voidable transfer action even though those funds would otherwise be beyond its reach. As such, the Court is not persuaded that the exclusion of fully encumbered deposit accounts from MUVTA liability flouts the purpose of the law.

In sum, the Court finds that the October 2018 Payment does not qualify as a "transfer" of an "asset" pursuant to the plain language of MUVTA. The Obergs' funds in the operating account were fully encumbered, meaning they were not an "asset" under MUVTA's definition, and therefore the Payment is not subject to a claim for fraudulent transfer. Accordingly, the Court will grant West Central's Motion for Summary Judgment because AFB's claim fails as a matter of law.

**III.     AFB'S MOTION FOR SUMMARY JUDGMENT**

AFB claims that the Obergs fraudulently induced it to make the $900K and $700K loans through presentation of false, incomplete, and materially misleading financial information. To prevail on a claim for fraudulent inducement, a plaintiff must show that:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge;
>
> (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false;
>
> (3) with the intention to induce another to act in reliance thereon;
>
> (4) that the representation caused the other party to act in reliance thereon; and
>
> (5) that the party suffered pecuniary damage as a result of the reliance.

*OrthoAccel Techs., Inc. v. Devicix, LLC*, No. 15-1503, 2015 WL 4563134, at *3 n.1 (D. Minn. July 29, 2015) (quoting *Hoyt Props., Inc. v. Prod. Res. Grp., LLC*, 736 N.W.2d 313, 318 (Minn. 2007)). Presentation of a false financial statement to induce a loan can give rise to a claim of fraud. *See Consol. Foods Corp. v. Pearson*, 178 N.W.2d 223, 225 (Minn. 1970).

There is no genuine dispute of material fact as to three of the five elements. First, the Obergs' financial disclosures to AFB were false because they were outdated as of the date submitted to AFB. Additionally, the Obergs represented that their 2017 tax returns were not yet available, but they had been completed in July. Second, the Obergs made the financial disclosures to AFB with the intent that AFB would act in reliance on these disclosures and make the desired loan. Third, AFB suffered pecuniary damages as a result of its reliance on the false disclosures.

However, there remains a genuine dispute of material fact as to whether AFB reasonably relied on the Obergs' financial disclosures. The reliance element in fraud cases "is generally evaluated in the context of the aggrieved party's intelligence, experience, and opportunity to investigate the facts at issue. When a party conducts an independent factual investigation before it enters into a commercial transaction, that party cannot later claim that it reasonably relied on the alleged misrepresentation." *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 369 (Minn. 2009) (citation omitted).

AFB is an experienced agricultural lender, and had an opportunity to do an independent appraisal of the grain bin site. AFB also made its own assessment of the risk of making a loan to the Obergs, articulated in the loan proposal, based not only on the December 31, 2017 financial statements, but also a bank representative's personal background with and knowledge of the Obergs. These facts create a reasonable inference that AFB conducted some degree of independent factual investigation before entering the transaction. Thus, there is a genuine dispute of material fact question about whether AFB's reliance on Obergs' financial disclosures was reasonable, and AFB has not proven its claim for fraudulent inducement as a matter of law. Accordingly, the Court will deny AFB's Motion with respect to Count III.

The Obergs do not contest AFB's Motion as to Counts I and II for Breach of Contract on the $900K loan against all Oberg Defendants and the $700K loan against Chad and

Leslie Oberg. Accordingly, there remains no genuine dispute of material fact as to either Count I or II, and AFB is entitled to judgment as a matter of law on Counts I and II.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant West Central Ag Services' Motion for Summary Judgment [Docket No. 37] is **GRANTED**; and

2. Plaintiff's Motion for Summary Judgment [Docket No. 53] is **GRANTED in part** and **DENIED in part** as follows:

    a. The Motion is **GRANTED** as to Counts I and II;

    b. The Motion is **DENIED** as to Count III.

DATED: March 30, 2021  
at Minneapolis, Minnesota.

                                          JOHN R. TUNHEIM  
                                          Chief Judge  
                                        United States District Court